IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

THOMAS SOUTHWORTH,
        Plaintiff,

v.                                    Civil Action No. 3:20-cv-55

OFFICER KHAIA JONES,
        Defendant.

## OPINION

Khaia Jones, a former police officer in Richmond City, shot Thomas Southworth in the elbow while arresting him. Jones sought to arrest Southworth for his suspected involvement in an unarmed robbery that occurred in neighboring Hanover County. During the arrest—which lasted just forty seconds—Southworth did not comply with Jones's orders to show his hands. Finally, Jones ordered Southworth to show his hands *and* get out of the car, difficult tasks to complete simultaneously. Southworth complied, but only partially; when he got out of the car, Jones could not see Southworth's left hand. Just as Southworth got both feet on the ground, Jones fired her weapon, hitting Southworth in the elbow.

Southworth asserts two claims against Jones: unreasonable seizure in violation of § 1983 and the Fourth Amendment of the U.S. Constitution (Count One) and state law battery (Count Two).

Jones moves for summary judgment as to both claims. (ECF No. 25.) For the reasons discussed below, the Court will deny Jones's motion and allow both claims to proceed.

## I. **FINDINGS OF FACT**[1]

Police suspected Southworth of robbing a woman at a Walmart in Hanover County on March 12, 2018. Specifically, they suspected him of ripping the lunch box off the shoulder of a Walmart employee on her way to work. (ECF No. 34-4, at 25:2–4.) Arising from these suspicions, Hanover County issued a felony warrant for Southworth's arrest.

On March 13, 2018, two Hanover deputy sheriffs—Douglas Kinder and Christopher Hatcher—came to Richmond to look for Southworth. The Hanover officers watched Southworth's sister's apartment and saw Southworth leave the apartment with his mother. The pair left in a white Chevy Impala; his mother drove, and Southworth rode in the passenger seat.

Kinder and Hatcher then called for assistance arresting Southworth. Richmond Police Department ("RPD") Officers Tristan Rossetti, Khaia Jones, Adam Hanson, and William McAuliffe responded to the call.[2] The RPD officers knew that Southworth was suspected of committing strong-arm robbery[3] by taking the lunch box of a woman outside Walmart.[4] They had

---

[1] The following facts include those that the parties do not dispute and those that this Court concludes a reasonable jury could find. Because Jones moves for summary judgment, the Court views the evidence in the light most favorable to Southworth.

[2] RPD Officers Rossetti, Jones, Hanson, and McAuliffe wore body cameras during the traffic stop. Jones attached the footage from these cameras to her brief in support of her motion for summary judgment. (ECF Nos. 26-12, 26-13, 26-14, 26-16.) Unless noted otherwise, the Court makes the following findings based on this footage.

[3] "Strong-arm" robbery means robbery without use of weapon.

[4] The parties dispute whether Jones knew about the details of Southworth's alleged offense at the time of the stop. Jones testified that she does not recall whether she knew at the time that Southworth was accused of merely taking a lunch box from a Walmart employee. (ECF No. 26-7, at 54:12–15 (answering, "I don't recall" to the question, "Were you ever told that they were looking at him for stealing a lunchbox off a person, of a Walmart employee inside Mechanicsville?").)

Southworth argues that Jones knew that he was wanted for taking a Walmart employee's lunch box. In support, he points to his mother's deposition testimony in which she recalled a conversation she had with investigators on March 12, 2018, the day before Jones shot Southworth.

2

also received a "Suspect Fact Sheet" about Southworth from the Hanover officers that said: "Southworth has a criminal history to include burglary, grand larceny, vandalism, possession of a weapon by a convicted felon, possession of marijuana, unlawful bodily injury, petit larceny, credit card fraud, and court violations." (ECF No. 26-9; *accord* ECF No. 26-7, at 33:1–4.)

Officers Jones, Rosetti, and Hanson converged on the white Chevy Impala in the parking lot of the Food Lion on Forest Hill Drive. The officers surrounded the car with their guns drawn as their training dictated. Rossetti approached the car from the driver's side, where Southworth's mother sat. Jones and Hanson approached the car on the passenger's side, where Southworth sat.

Walking behind the Impala, Jones yelled to Southworth, "Let me see your hands!" She repeated her instruction again and again.[5] In response, Southworth repeatedly said, "No," and shook his head. The body cameras show Jones screaming at Southworth, in increasingly frenetic excitement, punctuating her words with sundry versions of the verb "fuck." She shouted, "He's going in his pocket," several times. Rossetti then opened the driver's side door, and Jones ordered Southworth's mother out of the car. Ms. Southworth complied and pled with the officers not to shoot her son, assuring them that he did not have a gun. The officers continued to command

---

(ECF No. 34-5, at 21:20–22:9; 43:15–44:4.) Julie Southworth said the investigators "told [her] that [her son] would be killed if [she] didn't tell them where he was" and that "they were looking for him . . . [b]ecause he had stolen that lady's lunch bag." (*Id.* at 22:4–9.) Ms. Southworth testified that three RPD officers, including Jones, could hear this warning. (*Id.* at 43:15–44:16 (explaining that Jones "was . . . in a position to hear investigators tell [Ms. Southworth] that [her son] would get killed if he didn't turn himself in" for stealing the lunch box).)

Based on Ms. Southworth's testimony and Jones's foggy memory, the Court concludes that a reasonable jury could find that Jones knew that the robbery Southworth was suspected of involved his unarmed crime of taking a woman's lunch box outside of Walmart in Hanover County.

[5] In the forty seconds between when the RPD officers surrounded the Impala and when Jones shot Southworth, Jones commanded Southworth to show his hands twelve times. (ECF Nos. 26-12, 26-13, 26-14, 26-16.)

3

Southworth to show his hands. Southworth continued to not comply. During this time, Southworth did not sit still within the car; he looked from side to side and moved within the cabin to some extent.[6]

Jones then ordered Southworth to get out of the car and said, "Let me see your hands! You will get shot!" Southworth, complying with Jones's directive to get out of the car, pushed his door open with his right hand and began to get out of the car. Jones could not see Southworth's left hand when he got out of the vehicle or when she shot him.[7] As Southworth emerged from the car, Jones fired her gun, striking his elbow. At the time she shot him, Southworth did not face Jones directly; he stood at about a 45-degree angle to her.[8]

---

[6] Jones characterizes Southworth's movements as "furtive." (ECF No. 26-2, at 4 ("[Southworth] was making sudden furtive movements . . . .").) A reasonable jury could find, based on the body camera footage, that Southworth did not move furtively. Instead, a reasonable jury could find that he moved within the cabin in a way that was consistent with an intent to survey his surroundings, show his noncompliance to the police, and communicate with his mother.
Additionally, Jones testified that while Southworth sat in the car, she "observed [his] left hand go into his left pocket" when she stood outside the car. (ECF No. 26-7, at 35:22–23.) Based on the body camera footage, a reasonable jury could reject this testimony. Instead, a reasonable jury could find that Jones could not see Southworth's left hand from where she stood, several feet behind and to the right of Southworth.

[7] In her answers to Southworth's first interrogatories, Jones said that Southworth's left hand remained "concealed" in his left pocket when he got out of the car. (ECF No. 26-2, at 4.) Hanson, however, testified that Southworth's hands "were around [his] cargo pocket[s]" when he got out of the car, but he could not "say a hundred percent that they were inside of his cargo pocket[s]." (ECF No. 34-1, at 26:5–12.) A reasonable jury could find, based on the body camera footage, that Jones could not see Southworth's left hand when he got out of the car because of her position relative to Southworth. Jones, therefore, could not know whether Southworth had his hand in his pocket when he got out of the car.

[8] In her answers to Southworth's first interrogatories, Jones said that "Southworth was facing [her] when he exited the vehicle." (*Id.*) Based on the body camera footage, a reasonable jury could find that Southworth did not face Jones directly after he got out of the car. Instead, a reasonable jury could conclude that Southworth stood at about a 45-degree angle to Jones at the time of she shot him.

Southworth did not attempt to flee until after Jones shot him. He did not have a gun, and no one saw anything that looked like a gun. He did not have a gun-like bulge in his clothing. He did not say anything threatening to the officers. At worst, he just did not do what Jones wanted.

## II. DISCUSSION[9]

Southworth brings two claims against Jones. First, he says that Jones violated his Fourth Amendment rights when she shot him in the elbow during the traffic stop. Second, he says this shot amounted to a battery in violation of Virginia state law. Jones contests both claims. She claims (1) she *reasonably* used deadly force and (2) immunity protects her from both claims.

### A. Factual Disputes

A number of issues of material fact remain in this case. First, the record presents an open question about what Jones knew about Southworth before the ill-fated encounter. From the testimony of Southworth's mother, a jury could infer that Jones knew that Southworth had simply stolen someone's lunch box. *See supra* n.4.

Second, Jones's statements on the body camera that Southworth was "going in his pockets" as he sat in his car may not have a factual basis. From the video of the incident, Jones stood a number of feet away from the car, while Southworth sat in the passenger seat. It is difficult to believe that she could see what he was doing with his hands in the car. *See supra* n.6.

---

[9] Summary judgment becomes appropriate when the movant establishes that no genuine dispute of any material fact exists and the party is thereby entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant satisfies its showing for summary judgment, the burden shifts to the non-moving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). If a court finds that "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict," the court must deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Third, Jones claims that Southworth kept his left hand in his pocket as he got out of the car. Based on the body camera footage and Officer Hanson's testimony, however, a jury could find that Jones could not see Southworth's left hand when he got out of the car and, therefore, she did not know whether he reached into his pocket or just around his pants. *See supra* n.7.

As discussed below, what Jones knew and observed presents one of the critical issues in this case, and factual questions about her observations and knowledge remain. As it must at this stage of litigation, the Court resolves these disputes in Southworth's favor. Doing so compels the Court to conclude that when Jones shot Southworth, she violated both Virginia law and clearly established Fourth Amendment law, thereby precluding summary judgment.

### B. Fourth Amendment[10]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he Fourth Amendment's prohibition against unreasonable seizures" governs Southworth's "claim of excessive force . . . and is to be analyzed under the Fourth Amendment reasonableness standard" announced in *Graham v. Connor*, 490 U.S. 386, 385 (1989). *Mazuz v. Maryland*, 442 F.3d 217, 230 (4th Cir. 2006), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223, 235 (2009).

For an officer to reasonably use deadly force, the officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). "The officer's actions do not amount to

---

[10] When state officials violate the constitutional rights of Americans, the victims pursue justice under 42 U.S.C. § 1983. *See Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) (quoting 42 U.S.C. § 1983) ("Section 1983 . . . creates a private right of action to vindicate violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States.").

excessive force if they 'are "objectively reasonable" in light of the facts and circumstances confronting [her] . . . .'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at 397). When considering the "facts and circumstances of each . . . case," courts pay particular attention to the *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396).

Jones says it was objectively reasonable for her to conclude that Southworth posed a "significant threat of death or serious physical injury to the officer or others," *Garner*, 471 U.S. at 3, when he got out of the car because she reasonably believed he had and reached for a weapon. She argues that she reasonably believed Southworth had and reached for a weapon because he was wanted for strong-arm robbery; he did not cooperate with her commands to show his hands; and she could not see his left hand when he got out of the car.

In support of her argument, Jones relies largely on two Fourth Circuit cases: *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994), and *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001). In both cases, the Fourth Circuit concluded that officers did not use excessive force when they shot unarmed men. Both cases presented much stronger facts on which the officer could conclude that the men possessed guns. In *McLenagan*, an arrestee stole a gun from a magistrate's desk and ran from the building. A deputy chasing the arrestee yelled, "The man has got a gun." *McLenagan*, 27 F.3d at 1005. One of the officers at the scene heard the deputy's warning and shot McLenagan, mistaking him for the arrestee. The Fourth Circuit concluded that this mistake was reasonable. In *Russell*, an officer approached Anderson after observing a bulge near his waistband that the officer believed to be a weapon. The officer ordered Anderson to raise his hands and drop to his knees. Although Anderson dropped to his knees, he failed to raise his hands and reached towards his

7

pocket instead. Believing Anderson posed a significant threat of death or serious injury, the officer shot him. The Fourth Circuit held that this belief was reasonable.

In both *McLenagan* and *Russell*, the officers had specific evidence gleaned from their interactions with the suspects to support their beliefs that the suspect carried a weapon and posed a significant threat of death or serious physical injury—a witness's warning in *McLenagan* and a bulge in the suspect's waistband in *Russell*. Here, in contrast, Jones points to no specific evidence based on her interaction with Southworth that he had and reached for a weapon as he got out of the car.[11]

In addition, the *Graham* factors in this case "weigh heavily in [Southworth's] favor" and compel the conclusion that Jones's actions were not reasonable. *Id.* at 885. "Regarding the first *Graham* factor, the severity of the crime," Jones knew that Southworth was wanted for lunch-box-snatching—a crime most often punished by afterschool detention. *Ray*, 781 F.3d at 102. As for "the second *Graham* factor, whether the suspect poses an immediate threat to the safety of the officers or others," Jones could not have reasonably believed that Southworth had and reached for a weapon or otherwise posed a significant threat.[12] *Ray*, 781 F.3d at 102. She could not see

---

[11] Jones cites additional cases in her reply brief, but they suffer from similar infirmities as *McLenagan* and *Russell*. *See Slattery v. Rizzo*, 939 F.2d 213, 215–16 (4th Cir. 1991) (officer did not violate clearly established law when he used deadly force against a suspect in a stopped vehicle who repeatedly refused to show his hands and appeared to grip an object); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998) (officer reasonably used deadly force when he "reasonably perceived" the suspect coming towards him with a knife); *Betton v. Belue*, 942 F.3d 184, 191–92 (4th Cir. 2019) (observing that officers "may have been reasonable in concluding that 'a man who greets law enforcement with a firearm is likely to pose a deadly threat'" (quoting *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013))). The officer in each case could point to specific evidence gathered from his interaction with the suspect that supported his belief that the suspect held a weapon or an object that the officer reasonably mistook for a weapon.

[12] In fact, a reasonable jury could conclude that Ms. Southworth's statements that her son did not have a weapon gave Jones reason to believe that Southworth did *not* have a weapon.

Southworth's hands while he sat in the car, and she did not see him reach for or hold anything she could have reasonably mistaken for a weapon. When Southworth began to comply with Jones's orders to get out of the car, Jones could not see Southworth's left hand and still lacked any indication that it held a weapon. At most, in light of the facts a reasonable jury could find, Jones assumed that Southworth likely held a weapon because he did not show his left hand. But a reasonable jury could accept as true numerous alternative explanations for Southworth's failure to show his left hand to Jones as he emerged from the car, including the difficulty of getting out of a car while keeping both hands visible to an officer standing several feet behind and to the right of the car door—a task that becomes even more difficult when acting under the stress of a traffic stop as quick, profane, and heavily armed as this one. Finally, "the third *Graham* factor, whether the suspect was actively resisting arrest or attempting to evade arrest by flight," weighs neutrally. *Id.* Although Southworth did not comply with Jones's orders to show his hands, she gave him less than forty seconds to comply. And while defying her commands, Southworth did not physically struggle with the police or run away; he simply remained in the car.[13]

Jones may well have felt fear during this encounter. Her *subjective* motivation, however, does not figure into the Fourth Amendment analysis. To pass constitutional muster, her reaction must be *objectively* reasonable. And the law distinguishes between an officer who is "*concerned* that a suspect is holding a weapon" because she cannot see his hands and an officer who *reasonably believes* the suspect has a weapon. *Ray*, 781 F.3d at 104–05 (emphasis in original).[14] In this

---

[13] *See Brown v. City of Golden Valley*, 574 F.3d 491, 498–99 (8th Cir. 2009) (affirming the district court's finding that the police applied excessive force by tasing a car passenger who defied police commands but remained in her car and did not attempt to flee).

[14] Although an officer is not required "to actually detect the presence of an object in a suspect's hands before firing on him," she must have a reasonable belief that the suspect may be

9

situation, only a reasonable belief based on probable cause that Southworth had and reached for a weapon or otherwise posed a serious threat of death or serious physical injury could have justified Jones's use of deadly force. *See Slattery*, 939 F.2d at 216. The facts that a reasonable jury could find do not support such a belief.

For all these reasons, Jones used excessive force when she shot Southworth.

### *C. Qualified Immunity*

"Qualified immunity protects officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537–38 (4th Cir. 2017) (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). Courts "engage in a two-step inquiry, asking 'whether a constitutional violation occurred' and 'whether the right violated was clearly established' at the time of the official's conduct." *Id.* (quoting *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010)). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would have understood that what he is doing violates that right.'" *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 195–96 (4th Cir. 2015) (quoting *Reichle*, 566 U.S. at 664).

For the reasons discussed above, a reasonable jury could conclude that Jones violated Southworth's Fourth Amendment rights when she shot him in the elbow. The Court, therefore, proceeds to the second inquiry: "'whether the right violated was clearly established' at the time of the [Jones's] conduct." *Booker*, 855 F.3d at 537–38 (quoting *Greene*, 593 F.3d at 353).

Jones argues that even if she violated Southworth's constitutional rights, those rights were not clearly established at the time of her actions. Specifically, she asserts that it was not clearly

---

armed or otherwise poses a significant threat. *McLenagan*, 27 F.3d at 1007. Here, as discussed, any belief Jones had that Southworth was armed and reaching for a weapon was not reasonable.

10

established that shooting a suspect wanted for a violent felony after he disobeyed commands to show his hands and got out of the car without showing his left hand amounted to excessive force. Jones urges the Court "not to define clearly established law at a high level of generality." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, ---, 135 S. Ct. 1765, 1776 (2015). Instead, she reminds the Court that "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Jones says that Southworth moved furtively while he defied her commands and remained in the car with his hands down. According to Jones, established law shows that, in light of Southworth's furtive movements, she was justified in using deadly force against him. At the very least, therefore, she says that her actions did not violate clearly established law. In support, she cites a case in which a suspect's furtive movements helped justify law enforcement officers' use of deadly force. *See Swann v. City of Richmond*, 309 F. App'x 757, 759 (4th Cir. 2009) (affirming a district court decision that three officers acted reasonably to the extent they fired their guns towards a suspect who moved furtively within his car). *Swann* does not stand for what Jones says it does. To the extent the officers in *Swann* actually fired their weapons towards the suspect,[15] they did so after the suspect moved furtively within his car *and* drove his car towards the officers, knocking one to the ground.[16] Although furtive movement factored into the court's analysis, the

---

[15] The plaintiff in *Swann* could not show that two of the three defendant police officers "intended to shoot" or actually shot him. *Id.* Even so, the district court analyzed the plaintiff's excessive force claims against these officers as if he had made such a showing, and the Fourth Circuit adopted this analysis.

[16] In addition, one officer reasonably perceived that the suspect fired a weapon through the rear window of the car. *Id.* at 758–59.

11

factor bore less weight than Jones asks it to bear here.[17] Furthermore, a reasonable jury could conclude that Southworth did *not* move furtively within the car's cabin. *See supra* n.5.

Southworth counters that "[i]t is clearly established that officers cannot use deadly force when a suspect fails to obey their commands, even when that suspect's hands are in his pockets, unless the officer has sound reason to believe he is armed." (ECF No. 34, at 11.) He points to *Smith v. Ray*, 781 F.3d 95 (4th Cir. 2015), for support. In *Ray*, a police officer visited the home of Smith, whom the officer suspected of contributing to the delinquency of a minor. *Id.* at 98. The officer asked Smith to step onto her porch, and she complied. After answering several of the officer's questions, Smith turned to go inside the house to get someone the officer had asked about. When she tried to open the door, the officer grabbed her arm. Smith pulled away. The officer grabbed Smith again, threw her to the ground, "jammed his knee into her back, . . . twisted her arm behind her back," and punched her. *Id.* at 104. With Smith pinned to the ground facedown, the officer "became concerned that [she] had a weapon" because "she refused to show him her left hand." *Id.* at 104–05. The Fourth Circuit concluded that the officer applied excessive force in violation of the Fourth Amendment and that "any reasonable officer would have known" the situation did not justify such force. *Id.* at 103 (citing *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994), and the *Graham* factors). The court also concluded that any belief the officer held that Smith had a weapon was unreasonable for two reasons: he "saw no suspicious bulge in her clothing or any other indication that she was armed," and "she needed to keep her hand under her to be able to breathe." *Id.* at 105.

---

[17] Jones also cites *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018). There, the Supreme Court explained that "deliberately furtive actions and flight at the approach of . . . law officers are *strong* indicia" of suspects' knowledge that they were in a house unlawfully. *Id.* at 587. Whether a suspect displays a guilty conscience presents a different question than whether an officer reasonably used deadly force.

12

There are, of course, several distinctions between *Ray* and this case. First, the officer in *Ray* did not use deadly force, while Jones did. Second, the officer in *Ray* suspected Smith of a nonviolent misdemeanor—contributing to the delinquency of a minor—while Jones suspected Southworth of committing a felony—strong-arm (lunch box) robbery. Finally, the officer in *Ray* did not credit Smith with a criminal history that included crimes of violence, while Jones knew that Southworth's criminal history included possession of a weapon by someone with a felony conviction and unlawful bodily injury.

Despite these differences, "every reasonable official would have understood that" Jones violated Southworth's Fourth Amendment rights when she shot him as he complied with her directive to get out of the car. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). *Ray* made clear that when an officer cannot see one of the suspect's hands, even if the officer actually believes that the suspect holds a weapon, a reasonable jury could deem the officer's belief unreasonable unless the officer can point to some objective indication gleaned from the officer's interaction with the suspect that the suspect is armed. Here, Southworth failed to show Jones his left hand just as Smith refused to show her hand to the officer in *Ray*. The Fourth Circuit explained that despite this refusal, the officer's belief that Smith held a weapon was unreasonable because Smith had a legitimate reason for refusing to show her hand: she kept it under her body to allow her to breathe. Just like Smith, Southworth could explain his failure to show his left hand. A reasonable jury could conclude that he did not show his left hand because he was in the midst of complying with Jones's order to get out of the car, a feat difficult to accomplish with both hands visible to someone standing several feet behind and to the right.

For these reasons, *Ray* clearly established that it was unreasonable for Jones to believe that Southworth posed a significant threat of death or serious physical injury simply because she could

13

not see his left hand. Additionally, for all the reasons discussed in Section II.B, the *Graham* factors counsel against the application of qualified immunity in this case. *See* 490 U.S. at 396; *Ray*, 781 F.3d at 106 ("[T]he weakness of the *Graham* factors was so apparent that any reasonable officer would have realized that the force employed was excessive.").

Because any belief Jones had that Southworth posed a significant threat of death or serious physical injury was unreasonable, she unreasonably used deadly force in violation of clearly established law. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) ("Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful."). Qualified immunity does not protect Jones from Southworth's Fourth Amendment claim at this stage of litigation.

### D. Battery Claim

For reasons that remain unclear, Southworth did not argue that his battery claim should survive summary judgment. Southworth's failure to oppose Jones's motion for summary judgment, however, does not result in automatic victory for Jones. "In considering a motion for summary judgment, the district court '*must* review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'" *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 408 n.8 (4th Cir. 2010) (quoting *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993)). The Court, therefore, considers whether Southworth's battery claim survives Jones's motion.

### 1. Unexcused, Unjustified Use of Force

In Virginia, "battery is an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 265 Va. 12, 16, 574 S.E.2d 258, 261 (2003). "A legal justification for the act being complained of will defeat a[] . . . battery claim." *Unus v. Kane*, 565 F.3d 103,

117 (4th Cir. 2009). One such justification includes the use of "reasonable force" by police "execut[ing] their lawful duties." *Id.* When "a battery is based on the use of deadly force by a . . . police officer, the inquiry mirrors the 'objective reasonableness' inquiry in the Fourth Amendment context." *Warner v. Centra Health Inc.*, -- F. Supp. 3d --, No. 6:19cv55, 2020 WL 7018688, at *11 (W.D. Va. Nov. 30, 2020) (quoting *Russell ex rel. Russell v. Wright*, 916 F. Supp. 2d 629, 636 (W.D. Va. 2013)).

Jones says that because "her actions were legally justified and objectively reasonable under the circumstances," the Court should grant summary judgment in her favor on Southworth's battery claim. (ECF No. 26, at 28.) For the same reasons discussed in Section II.B, however, a reasonable jury could conclude that Jones unreasonably used deadly force against Southworth and, therefore, her use of force "is neither . . . excused, nor justified." *Koffman*, 256 Va. at 16. Virginia law affords an officer some leeway to judge the amount of force required in any situation. But the officer must act reasonably, and the reasonableness of a use of force typically presents a question for the jury. *Davidson v. Allam*, 143 Va. 367, 372, 130 S.E. 245, 246 (1925).

The Court also dismisses any self-defense arguments to the extent Jones raises them. *Harper v. Commonwealth*, 196 Va. 723, 729–30, 85 S.E.2d 249, 253 (1955) (identifying self-defense an excuse for battery). "The plea of self-defense is a plea of necessity and the necessity must be shown to exist or there must be shown such reasonable apprehension of the immediate danger, by some overt act, as to amount to the creation of necessity." *Vlastaris v. Commonwealth*, 164 Va. 647, 651, 178 S.E. 775, 776 (1935). A police officer cannot use deadly force in self-defense "unless there is a necessity for it, and the jury must determine upon the testimony the existence or absence of that necessity. They must judge the reasonableness of the grounds upon which the officer acted." *Couture v. Commonwealth*, 51 Va. App. 239, 250, 656 S.E.2d 425, 431

(2008). "In short, the right to use deadly force in self-defense 'begins where the necessity begins and ends where it ends'" and "the question of necessity 'is pre-eminently a question of fact and therefore a question for the jury.'" *Id.* (quoting *Thomason v. Commonwealth*, 178 Va. 489, 498, 17 S.E.2d 374, 378 (1941) & *Hendricks v. Commonwealth*, 163 Va. 1102, 1110, 178 S.E. 8, 11 (1935)).

As discussed in Section II.B, a reasonable jury could conclude that Jones did not reasonably apprehend immediate danger and, therefore, she unnecessarily used deadly force. *See Yarborough v. Commonwealth*, 217 Va. 971, 975, 234 S.E.2d 286, 290 (1977) ("[B]are fear that a person intends to inflict serious bodily injury on the accused, however well-grounded, unaccompanied by any overt act indicating such intention, will not warrant killing such person."). For these reasons, any claim that Jones's use of deadly force was "legally justified and objectively reasonable" falters.

### 2. Good Faith Defense

"Virginia law provides a defense to officers who subjectively 'believed[] in good faith, that [their] conduct was lawful' and whose subjective beliefs were objectively reasonable." *Wingate v. Fulford*, 987 F.3d 299, 312 (4th Cir. 2021) (alterations in original) (quoting *DeChene v. Smallwood*, 226 Va. 475, 479, 311 S.E.2d 749, 751 (1984)). The Fourth Circuit has interpreted "Virginia's good-faith exception" as "congruent with the federal qualified immunity defense." *Id.*[18] Thus, for the same reasons qualified immunity does not protect Jones, (*see supra* Section II.C), the Court finds the good-faith exception does not protect her either.

---

[18] This Court follows the Fourth Circuit's guidance on this issue because there has been no intervening decision from Virginia's Supreme Court interpreting the scope of the good-faith exception. *See Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 631 (D. Md. 2015) ("Typically, the Fourth Circuit's prediction as to how a state's highest court would resolve a particular issue 'is binding on district courts in this circuit . . . .' *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). That

In the context of battery by police officers, the defense of "good faith" entails a further factual examination. When an officer acts from anger or malice, she loses the protection of "good faith." *Davidson*, 143 Va. at 373. She can be liable "for actual damage, where the injury is inflicted because of anger resulting from provocation, and for punitive damages where the injury is inflicted through malice." *Id.* Here, a jury observing Jones threatening to shoot Southworth, screaming loudly at him, and cursing him could conclude that she acted from anger or malice. In these circumstances, the "good faith" defense evaporates.

### III. CONCLUSION

For the foregoing reasons, the Court will deny Jones's motion for summary judgment.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 29 March 2021
Richmond, VA

/s/ /g./
John A. Gibney, Jr.
United States District Judge

---

general rule does not apply, however, where 'an intervening decision of the state's highest court has resolved the issue.' *Id.*").